**COMMONWEALTH of Pennsylvania,**

v.

**William PAGE, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 2, 2012.

Filed Jan. 7, 2013.

Suzanne M. Swan, Public Defender, and Victoria H. Vidt, Public Defender, Pittsburgh, for appellant.

Michael W. Streily, Deputy District Attorney, Rebecca Good McBride, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: BENDER, DONOHUE, and STRASSBURGER,* JJ.

OPINION BY STRASSBURGER, J.:

Appellant, William Page, appeals from the judgment of sentence of life in prison after a jury convicted him of first-degree murder, kidnapping, aggravated indecent assault of a child, and false reports to law enforcement.[1] Appellant has also filed a motion to strike a document from the certified record. After careful review, we deny the motion and affirm Appellant's judgment of sentence.[2]

The trial court summarized the underlying facts as follows.

In February of 2007, [Appellant] was living with his girlfriend, [D.R.], and her six year old son, [X.H.] and their twenty-three month old daughter, [Victim], [in the Borough of Braddock]. Also living in this house was [Appellant's] mother, Mary Ann Page, her boyfriend, Shauntaz, and [Appellant's] brother, James Page. [Appellant] and [D.R.]

---

* Retired Senior Judge assigned to the Superior Court.

1. 18 Pa.C.S. §§ 2501(a), 2901(a)(1), 3125, and 4906(a), respectively.

2. On June 5, 2012, the Commonwealth filed a petition to modify the certified record with this Court pursuant to Pa.R.A.P. 1926. Specifically, the Commonwealth requested that a transcript of Appellant's confession be added to the certified record. Before Appellant had an opportunity to respond, that petition was granted. On July 3, 2012, Appellant filed a motion to strike a document from the certified record. Appellant argued that both the Commonwealth's procedural missteps at the trial court and the fact that the transcript was "never entered into evidence" at trial, warranted the document being stricken from the certified record. Petition to Strike Document from the Certified Record, 7/3/2012, at 3. However, this Court's review of the certified record reveals that this document was entered into evidence, without objection, during Appellant's suppression hearing on May 27, 2009. Specifically, the Commonwealth identified "the transcript of the reported statement of [Appellant]" which was transcribed by "the secretary for the homicide unit." N.T., 5/27/2009, at 19–21. Appellant did not object. Id. at 21. As such, the trial court did not err in making this transcript part of the certified record and we cannot see how Appellant is now prejudiced in any way by this Court having the opportunity to review the transcript of the recorded statement on appeal. Accordingly, we deny Appellant's motion to strike the document from the certified record.

shared a bedroom on the third floor and across the hall from them, [X.H.] and [Victim] shared a bedroom. On the second floor, [Appellant's] mother and her boyfriend shared one bedroom and [Appellant's] brother, James, used the other bedroom. The first floor consisted of the living room, kitchen and bathroom. One-half of the basement was used for a laundry room and the other half was used for [Appellant's] "dungeon." [Appellant] had a chair, mattress, television and Play Station games set up in this area and that is where he would go to watch his pornographic movies.

On February 3, 2007, at approximately 7:00 a.m., [X.H.] went into his mother's bedroom and asked her where [Victim] was. [D.R.] told him that [Victim] was in their bedroom and that he should go back to his room. [X.H.] told his mother that [Victim] was not there and then [D.R.] and [Appellant] both got up and got dressed and went through the house looking for [Victim] but were unable to locate her. [Appellant] went outside, went around the premises and could not locate her and then came back in, dialed 911 on a portable phone and then gave the phone to [D.R.] so that she could tell the police that her twenty-three month old daughter was missing.

James Caterino, (hereafter referred to as "Caterino"), a part-time Braddock police officer, was the first police officer to arrive on the scene. Caterino was met by the residents of the house and he noticed that [D.R.] was hysterical about her missing daughter and, yet, [Appellant] seemed emotionless since he had no expression and he did not appear to be upset. Officer Latisha Cassidy, (hereinafter referred to as "Cassidy"), of the Rankin Police Department, arrived on the scene to assist the Braddock Police and she sat with [Appellant] for an extended period of time and she also noted that he appeared to be emotionless. The Braddock Police Department contacted the Allegheny County Police Department and asked for assistance since they did not have sufficient manpower to conduct an intensive search for this missing child. In addition to contacting the Allegheny County Police, the Braddock Police Department put out an Amber Alert for [Victim].

Detectives Dennis Kozlowski, (hereinafter referred to as "Kozlowski"), and Michael Caruso, (hereinafter referred to as "Caruso"), from the Allegheny County Police conducted the initial interviews with residents of [Appellant's] household. In light of the frantic atmosphere in the house, it was decided that it was best to remove all of these individuals from the house so that an extensive search of the house could be made and also to enable them to conduct more in-depth interviews with each of the residents. Before the residents were removed from the house, a cursory search of the house was made. In the dungeon area of the basement, the police found a Steelers' Terrible Towel soaked through with blood. They found a child's t-shirt also soaked with blood. In addition, they found women's underwear soaked with blood and a mattress cover and sheet that covered a mattress also having blood stains. While they were collecting this evidence, [Appellant] told the police that a non-functioning blue electric blanket was missing from the basement area.

From February 3, 2007 through February 7, 2007, the Braddock Police, the Allegheny County Police, and the FBI, which had been called in as a result of the disappearance of [Victim], repeatedly interviewed [Appellant]. The Braddock Police interviewed [Appellant] at his residence shortly after they arrived

after receiving the call about [Victim's] disappearance. After all of the residents were removed from the house, [Appellant] was taken to the Braddock Police Department where Caruso initially interviewed him. [Appellant] was then transported to the Allegheny County Police Headquarters where he was interviewed by Detective Edward Adams, (hereinafter referred to as "Adams"), and later reinterviewed by Detective Edward Fischer, (hereinafter referred to as "Fischer"). All of the other residents of the house were repeatedly interviewed, including [X.H.]. [X.H.] was interviewed because he was the last person to have seen [Victim] alive and during the course of this forensic interview, [X.H.] told Dr. Silver that [Appellant] had touched him inappropriately shortly before [Victim] followed [Appellant] out of their bedroom. County Detectives Gregory Matthews, (hereinafter referred to as "Matthews"), and Fischer observed Dr. Silver's interview of [X.H.] through a two-way glass and as a result of this allegation, decided to reinterview [Appellant].

[Appellant] was brought to the Allegheny County Police headquarters and initially was interviewed by Adams. Prior to asking [Appellant] any questions, Adams advised him of his *Miranda*[3] Rights and had [Appellant] sign the County *Miranda* Warnings Form. Matthews and Fischer then interviewed [Appellant] approximately two and one-half hours later and these Detectives advised him of the claim made by [X.H.], which claim [Appellant] denied. The Detectives conducted their interview and at the conclusion of that interview, [Appellant] then said to him that he would check the woods by the railroad track. [Appellant] was arrested and charged with the crime of indecent assault of a child and was transported to the Allegheny County Jail. While [Appellant] was being transported to the Allegheny County Jail, he was asked if he would be willing to speak to the FBI and [Appellant] said he would be.

On February 4, 2007, [Appellant] was interviewed by Agent John Kelly, (hereinafter referred to as "Kelly"), of the FBI at the FBI headquarters. Kelly did not *Mirandize* [Appellant] since he had been advised that [Appellant] had previously been *Mirandized*. In the course of that interview, [Appellant] told Kelly that he believed that the blue blanket had something to do with [Victim] and he did not believe that a stranger had something to do with this but, rather, he suggested that the FBI should look at friends of his brother or friends of his mother's boyfriend. At the conclusion of this interview [Appellant] put his head down and began to cry; however, Kelly noticed no tears and believed that this was an act put on for his benefit.

While the FBI was interviewing [Appellant], the more than one hundred police officers and volunteers were still canvassing the area in and around [Appellant's] residence in Braddock. From the command post that had been set up, search teams were dispatched to various areas and were told to work a grid in searching for [Victim]. Allegheny County Police Detective Timothy Stetzer, (hereinafter referred to as "Stetzer"), was working with five other FBI agents in a grid that had been assigned to him. On the morning of February 4, they found a diaper on the railroad tracks that traversed the grid. They took this diaper into evidence and when it was brought to the command site, it was

---

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

determined that this diaper was similar to the diapers that [Appellant] and [D.R.] had purchased on February 2, 2007. At approximately 2:00 p.m. on February 4, Stetzer and his team continued their search and as they were walking the grid area, they came to a hollow or ravine and Stetzer discovered a broken, wooden step and staircase that led to a wooded area and overgrown basketball courts that were no longer used. Stetzer and his team began to walk this area when one of the FBI agents yelled out that he thought he saw a blue blanket. Because of Stetzer's location, he was the first individual to arrive at the blanket and they noticed that it was a blue blanket with electrical wires. Since they had been alerted that a blue blanket might be with [Victim], they continued to search this area, only to discover the body of [Victim] facedown, frozen to the ground. She was clad only in a maroon-striped sweater. The temperature during the period of February 2 through February 4, was in the single digits and the wind-chill factor reached minus nine degrees.

Following the discovery of [Victim's] body, Detective Andrew Sherman, (hereinafter referred to as "Sherman"), went to the FBI headquarters where [Appellant] was being interviewed for a second time. Sherman had been advised that [Appellant] had been *Mirandized* again and then told [Appellant] that they had found his daughter and that she was dead. [Appellant] reacted by trying to cry, however, he had no tears. This was noted by all of the individuals who were present in the room with him. [Appellant] then told Sherman what happened. [Appellant] said that in the early hours of February 3, he was down in his dungeon when he encountered [Victim] on the first floor. He told her to get back in bed and when she did not, he hit her and she fell to the floor and went unconscious. [Appellant] ran to the basement to get the Steeler Terrible Towel since [Victim] had a big gash in her forehead. Not knowing what to do, he wrapped her up in the blue blanket, took her outside and then put her by the railroad tracks and returned to his residence. At the conclusion of the interview, Sherman contacted the command post, relayed the information that he had, and he was then advised that [Victim] had no gash on her forehead. Sherman then confronted [Appellant] with the fact that [Victim] had no gash and [Appellant] told him everything that he had just told Sherman was a lie and that he knew they did not find her by the railroad tracks. He then said he just wanted to get this over and that they should sentence him.

The police continued with their investigation and were able to discover a witness who was a neighbor. Ebony Mitchell told police that she was getting ready for work in the early morning hours of February 3 when she looked out her window and saw [Appellant] returning to his house from the direction of the railroad tracks and abandoned playground. In light of [Appellant's] claim that he had hit [Victim], thereby causing a gash to her forehead, the police went back to his residence and put luminol, a chemical that detects blood, in the area where [Appellant] said [Victim] fell and cut her forehead and found no evidence of blood.

On February 6, 2007, [Appellant] was taken from the Allegheny County Jail to Homicide Headquarters where he was interviewed by Detective Lawrence Carpico, (hereinafter referred to as "Carpico"). Before the interview started, Carpico explained [Appellant's] rights and had him execute another *Miranda*

rights form. Carpico ended their interview when [Appellant] said he wanted to speak to his lawyer. On February 7, 2007, Detective Robert Opferman, (hereinafter referred to as "Opferman"), arrested [Appellant] and charged him with the crimes of criminal homicide and kidnapping. [Appellant] then told the police that he wanted to talk to them and once again he was given his *Miranda* rights and again executed another County *Miranda* Rights Warnings form. [Appellant] gave both a written and taped statement in which he told the police that he was in the basement of his house at approximately 3:00 a.m. when [Victim] came down the basement steps and took off her diaper and threw it on the floor. He told her to put the diaper back on, she refused to do it, he put the diaper back on and once again, she took it off. [Appellant] then became enraged and kicked her between the legs while he was wearing a Timberland boot. [Victim] then began to [bleed] and [Appellant] got the Terrible Towel in an attempt to stop the bleeding. He got a t-shirt and women's underwear and tried to dab the blood that was coming from [Victim]. [Appellant] then inserted two of us fingers into her vagina in what he said was an attempt to stop [Victim] from bleeding. He then decided to take her outside and he wrapped her in an electric blanket and he walked to the area of the abandoned basketball courts, which was located in a small ravine and then put her on the ground and walked a short distance away and watched her for ten minutes. [Appellant] then walked home and went back to bed and went to sleep.

[Victim's] body was turned over to the medical examiner and an autopsy was done. During the course of the autopsy no signs of trauma appeared in her vaginal area or either of her thighs. During the course of the autopsy, swabs were taken. Those swabs including rectal swabs, oral swabs and vaginal swabs. The test results of those swabs were not received for several months; however, when they were received it revealed that the vaginal swab was positive for blood. In addition, DNA tests on the articles that were found in the basement also came back and those test results revealed that the blood that was found in the basement was [Victim's] blood. During the performance of the autopsy, no injury was noted in [Victim's] vaginal area.

Trial Court Opinion, 10/18/2011, at 4–11.

On February 7, 2007, Appellant was charged with one count of criminal homicide, one count of simple assault, one count of kidnapping, and one count of false reports to law enforcement in connection with Victim's death.[4] Subsequently, the simple assault count was withdrawn, and counts for aggravated indecent assault, aggravated indecent assault of a child, and aggravated assault were added.[5] The Commonwealth filed a notice of intent to seek the death penalty.

On March 20, 2008, the Commonwealth filed a motion to join the two criminal cases related to Appellant. The Commonwealth asserted that the cases were appropriate for joinder because the cases would tell the "complete story." Commonwealth Motion for Joinder, 3/20/2008, at 2 (unnumbered). After a hearing, the trial court granted that motion.

On May 12, 2009, Appellant filed a motion to sever the previously joined cases, a

---

4. 18 Pa.C.S. §§ 2501(a), 2701(b)(2), 2901(a), and 4906(a), respectively.

5. 18 Pa.C.S. §§ 3125(a)(7), 3125(a)(1) and (b), and 2702(a)(1), respectively.

motion to suppress certain statements made during the course of the police interviews, and a motion *in limine* regarding Appellant's prior bad acts against X.H. On May 27, 2009, the trial court granted the motion to sever and denied both the motion to suppress and motion *in limine.*

On September 22, 2009, the Commonwealth filed a motion for reconsideration of the trial court's grant of the motion to sever, or in the alternative, to allow the use of evidence of Appellant's prior bad acts against X.H. at trial. After a hearing, the trial court granted reconsideration of the motion to sever, and entered an order allowing both cases against Appellant to be tried together.

From February 18 to March 22, 2010, Appellant was tried before a jury. The jury convicted Appellant of the aforementioned charges related to Victim; however, the jury was unable to reach a unanimous verdict on the charges related to X.H.[6] The case immediately proceeded to the penalty phase. Again, the jury was unable to reach a unanimous decision on Appellant's sentence; accordingly, the trial court sentenced Appellant to life imprisonment without the possibility of parole for the murder conviction.

On June 22, 2010, Appellant was sentenced on the remaining convictions. Appellant filed a timely post-sentence motion, which was denied by the trial court. Appellant filed a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant presents four issues for our review:

I. Did the [trial court] err in finding the minor, [X.H.], competent to testify at trial even though the minor had no independent recollection of the events on the night in question and what recollection

he had had been indelibly tainted by the repeated questioning of the prosecutor, the man he called "T Rex"?

II. Did the [trial court] err when it denied the motion to suppress statements that had been obtained in violation of [Appellant's] constitutional rights?

III. Did the [trial court] err when it failed to sever the charges relating to an alleged indecent assault of [X.H.] from the homicide charges related to [Victim]?

IV. Did the [trial court] err in permitting Dr. Mary Carrasco to testify as an expert in this case since her testimony lacked indicia of scientific reliability, her methodology is not accepted by her peers, and her conclusions were based upon photographs of other girls, not the Victim ... ?

Appellant's Brief at 8.

■■■■ Appellant first argues that the trial court erred in concluding that X.H. was competent to testify. Specifically, Appellant contends that "the court should have ruled that [X.H.] was incompetent because he demonstrated that he did not have an independent recollection of the events in question, and because there is a suggestion that his testimony may have been improperly tainted by the Deputy District Attorney." Appellant's Brief at 20. Appellant further argues that X.H. was not competent to testify because "[X.H.'s] grasp of the importance of telling the truth was minimal." *Id.* at 23.

Our standard of review recognizes that [a] child's competency to testify is a threshold legal issue that a trial court must decide, and an appellate court will not disturb its determination absent an

---

**6.** The Commonwealth later *nolle prossed* those charges.

abuse of discretion. Our scope of review is plenary.

*Commonwealth v. Pena*, 31 A.3d 704, 706 (Pa.Super.2011).

Instantly, the trial court conducted a competency hearing outside the presence of the jury, which included the following testimony:

By [Assistant District Attorney]:

\* \* \*

Q. Okay. [X.H.], do you have any brothers or sisters?

A. Yep.

Q. Okay, who is your little brother?

A. Nyxia.

Q. Do you know how old he is?

A. Two.

Q. Okay. What was your sister's name?

A. [Victim].

Q. Okay. Can you tell me, who lived on the top floor of that house?

A. Me, [Appellant], [Victim] and my mom.

Q. Who lived on the second floor of the house?

A. Marianne.

Q. And did she have a boyfriend?

A. Yes.

Q. What was his name, do you remember? What did you call him?

A. Old man.

Q. Okay. Did [Appellant] have a brother?

A. Yeah.

Q. What was his name?

A. J.R.

Q. Did J.R. live in the house?

A. Yeah.

Q. Okay. Now, [X.H.], back then do you remember when [Victim] disappeared?

A. Yes.

Q. Back then where did you go to school?

A. Schaeffer.

Q. Okay. Did you have your own bedroom or did you share your bedroom?

A. Share.

Q. With who [ (*sic*) ]?

A. [Victim].

Q. What kind of bed did you have?

A. A car bed.

Q. What kind of bed did [Victim] have?

A. A crib.

Q. Okay. Do you remember what color it was, [Victim's bed], do you remember?

A. No.

Q. Okay. Did you guys have a TV in your room?

A. Yes.

Q. What color was the TV?

A. Pink.

Q. Okay. Now, [X.H.], do you know the difference between telling the truth and telling a lie?

A. Yes.

Q. Is it good or bad to tell the truth?

A. Good.

Q. Is it good or bad to tell a lie?

A. No.

Q. Are you supposed to tell lies?

A. No.

Q. What happens to you if you tell a lie?

A. [Appellant] will beat me.

Q. Okay. With what?

A. A belt.

Q. Okay. Now, do you understand you are supposed to tell the truth today, do you understand that?

A. Yes.

Q. Can you do that for us?

A. Yeah.

Q. Okay. What grade are you in now?

A. Third.

Q. How old are you?

A. Nine.

Q. Okay. This man is going to ask you some questions, okay?

A. Okay.

Cross–Examination by Defense Counsel:

Q. Good morning, [X.H.]. . . . I'm going to ask you some questions like what do you call this man right there?

A. TRex.[7]

Q. Did you talk to T–Rex before you came in here and answered questions?

A. Yes.

Q. How many times did you talk to him; do you know?

A. A lot.

Q. And he talked to you about what you were going to say in court, right?

A. Yes.

Q. And he talked to you about the same questions he asked you just now, he asked you those questions when you were in his office with him, right?

A. Yes.

Q. And he told you what to say, didn't he?

A. Yes.

Q. And he told you that he was going to ask you that if you tell a lie what would happen?

A. Yes.

Q. And he told you to say that if you told a lie that [Appellant] would hit you with a buckle, he told you that, right?

A. Yes.

Q. Now, he asked you questions about your bed. When you lived with Marianne you had a race car bed, right?

A. Yes.

\*　　\*　　\*

Q. You stated—you remember when you couldn't find [Victim], right?

A. Yes.

Q. You don't remember what happened the night before [Victim] was missing, do you?

A. No.

Q. But people tried to tell you what happened, didn't they?

A. Yes.

\*　　\*　　\*

Q. Now, you really do not remember what happened three years ago, do you?

A. No.

Q. You don't remember what happened to your sister?

A. No.

Q. You don't remember what, if anything, [Appellant] did to you?

A. No.

\*　　\*　　\*

Q. When you spoke to them those other times they told you what to say; is that what happened?

A. Yes.

Q. They would repeat the same thing that they wanted you to say over and over; is that right?

A. Yes.

---

7. "It should also be noted that [X.H.] had a speech impediment which often made it difficult for him to be understood and that he was conscious of this speech impediment. The Deputy District Attorney who tried this case was Mark Tranquilli and it is clear that he allowed [X.H.] to call him T–Rex because it was easier for [X.H.] to call him that than to try to say his name." Trial Court Opinion, 10/18/2011, at 21.

Q. You really don't remember what happened three years ago, do you?

A. No.

N.T., 3/10/2010—3/12/2010, Vol. 1, at 245–255.

■ In considering this testimony, we keep in mind the following:

Every witness is presumed competent. A party who challenges the competency of a minor witness must prove by clear and convincing evidence that the witness lacks the minimal capacity ... (1) to communicate, (2) to observe an event and accurately recall that observation, and (3) to understand the necessity to speak the truth.

*Pena,* 31 A.3d at 706.

As to the first prong of the competency test, the trial court concluded that "it was clear that [X.H.] had the ability to both understand questions and to intelligently provide answers to those questions." Trial Court Opinion, 10/18/2011, at 21. As Appellant makes no argument with regard to this conclusion, and our review of the record supports the trial court's decision, we conclude the trial court did not abuse its discretion as to this prong.

■ We now consider Appellant's arguments in light of X.H.'s answers as they impact on the second and third prongs of the test. As to the second prong, Appellant contends that X.H.'s "inappropriate" answer to one question, along with an assertion that Appellant would beat X.H. with a belt if he told a lie, sounded like a "rehearsed answer." Appellant's Brief at 24. Appellant also argues that the fact that X.H. spoke to the Deputy District Attorney many times prior to trial "supports the conclusion" that the Deputy District Attorney improperly influenced X.H. causing his testimony to be tainted.

The Pennsylvania Supreme Court has defined "taint" as ... the implantation of false memories or distortion of actual memories through improper and suggestive interview techniques[.] Within the three-part test described above, [t]aint speaks to the second prong ..., the mental capacity to observe the occurrence itself and the capacity of remembering what it is that the witness is called upon to testify about.

In discussing testimonial competency, Pennsylvania courts have clearly and unequivocally stated that taint is only a legitimate question for examination in cases involving complaints of sexual abuse made by young children.... Further, the concerns underlying the three-part test for evaluating the testimonial competency of minors become less relevant as the witness's age increases, ultimately being rendered totally irrelevant as a matter of law by age fourteen. In *Commonwealth v. Moore,* 980 A.2d 647 (Pa.Super.2009), this Court reiterated that the critical age for purposes of conducting a taint hearing is not the age at the time of the crime but the age at the time of trial.

*Pena,* 31 A.3d at 706–7.

Instantly, the trial court concluded that Appellant's testimony was not tainted by repeated meetings with the Assistant District Attorney, and offered the following rationale:

It is unquestioned that [X.H.] met with the Deputy District Attorney who handled this case on numerous occasions since [Appellant's] case was continued on six different occasions, all at the defense request. These meetings were designed to prepare [X.H.] for trial and repeated since they were all defense postponements. [X.H.'s] meeting with Dr. Silver at Mercy Hospital was viewed by two County Police Detectives and both Detectives indicated that the allegation of sexual abuse that [X.H.] made

against [Appellant] was spontaneously made and not in response to any prompting by Dr. Silver or anyone else. From Dr. Silver's testimony, when reviewed in light of the testimony of Matthews and Fischer[, the two detectives who viewed the interview,] it is clear that no one influenced or tainted [X.H.'s] testimony and that he was competent to testify at the time of trial.

Trial Court Opinion, 10/18/2011, at 21–22. Our review of this record supports this analysis.

█ The concept of taint is particularly concerned with "the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement . . . that are so unduly suggestive and coercive as to infect the memory of the child." *Commonwealth v. Davis*, 939 A.2d 905, 911 (Pa.Super.2007). Thus, it is particularly important to recognize that X.H.'s testimony was consistent with the testimony of Detective Matthews. Matthews testified at the competency hearing that he observed X.H. tell Dr. Silver during the forensic interview about what happened the night Victim disappeared and his own sexual abuse by Appellant.

It was unexpected in that when Dr. Silver had [X.H.] lay out the dolls he identified one doll as being himself, another doll as being [Victim], and he identified a third male doll as an individual that he called dad which we established was [Appellant]. In laying out the dolls, he had put both himself and [Victim] in the same bed and he identified [Appellant] as laying next to the bed on the

floor and that he spontaneously disclosed that dad touched me on the balls. N.T., 3/10—3/12/2010, Vol. 1, at 280.

Thus, because X.H. testified consistently with what he had spontaneously told Dr. Silver shortly after the incident happened, the trial court did not err in concluding that there was no taint. Furthermore, there is nothing improper about the Deputy District Attorney meeting with a witness to prepare testimony. This is particularly important due to the lapse of time between the events in question (2007) and the trial (2010).

█ Finally, even though X.H. did answer certain questions inconsistently about telling the truth, we cannot say that the trial court abused its discretion in determining that X.H. was competent to testify. "Questions concerning inconsistent testimony . . . go to the credibility of the witnesses." *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 106 (2004). "A determination of credibility lies solely within the province of the factfinder. Moreover, any conflict in the testimony goes to the credibility of the witnesses and is solely to be resolved by the factfinder." *Commonwealth v. Price*, 420 Pa.Super. 256, 616 A.2d 681, 685 (1992) (internal citations omitted). Here, the trial court had the opportunity to observe X.H. testify and determined that it was "clear that [X.H.] understood his obligation to tell the truth." Trial Court Opinion, 10/18/2011, at 21. We will not disturb that determination. Thus, Appellant is not entitled to relief on this issue, and we conclude the trial court did not err in finding X.H. competent to testify.[8]

---

**8.** We also point out that X.H.'s testimony regarding his sexual abuse was not a significant factor in Appellant's conviction for Victim's murder, particularly in light of all the other evidence presented. The Commonwealth presented Appellant's confession to the murder, a witness who saw Appellant, and physical evidence from Appellant's dungeon. Accordingly, even if the trial court erred in concluding X.H. was competent to testify, any such error was harmless.

■ Appellant next argues that the trial court erred when it denied his motion to suppress statements which Appellant alleges were made in violation of his *Miranda* rights. Appellant's Brief at 27–38. Once again, no relief is due to Appellant. We keep in mind that

> our role is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. In making this determination, we may consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the [evidence supports the factual findings of the suppression court], we may reverse only if there is an error in the legal conclusions drawn from those factual findings. As a reviewing court, we are therefore not bound by the legal conclusions of the suppression court and must reverse that court's determination if the conclusions are in error or the law is misapplied.

*Commonwealth v. Turner*, 772 A.2d 970, 972–73 (Pa.Super.2001).

Instantly, Appellant was subjected to four separate custodial interrogations. During Appellant's fourth and final interrogation, he made an inculpatory statement admitting his role in Victim's death. Specifically, Appellant admitted he was frustrated with Victim taking off her diaper and not going to bed, so he wrapped Victim tightly in a blanket, went outside, then "left her in the weeds" while she was crying. Transcript of Appellant's Recorded Statement, 2/7/2007, at 3. On appeal, Appellant argues that once he invoked his *Miranda* rights during an interrogation on the evening of February 6, 2007, any further questioning without an attorney present is improper unless Appellant both initi-

ated further discussions with police and knowingly and intelligently waived the rights previously invoked. Appellant's Brief at 29–30. Appellant contends that he neither reinstated discussion with law enforcement nor knowingly and intelligently waived his right to counsel; thus, Appellant argues the trial court erred in failing to suppress the statements and he is entitled to a new trial.

The trial court concluded that after Appellant was arrested for Victim's death, he "told the police that he wanted to tell them what happened to his daughter." Trial Court Opinion, 10/18/2011, at 29. Thus, "[b]y initiating a conversation with the police, [Appellant] knowingly and intelligently waived his rights that had previously been explained to him numerous times." *Id.* We agree.

■ We keep in mind that not every statement made by an individual during a police encounter constitutes an interrogation. *Miranda* rights are required only prior to a custodial interrogation. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [his] freedom of action in any significant way. Furthermore, volunteered or spontaneous utterances by an individual are admissible without the administration of *Miranda* warnings. When a defendant gives a statement without police interrogation, we consider the statement to be volunteered and not subject to suppression.... Interrogation is police conduct calculated to, expected to, or likely to evoke admission.

In *Commonwealth v. Sepulveda*, 579 Pa. 217, 855 A.2d 783, 796–797 (2004) (Castille concurring), *cert. denied*, 546 U.S. 1169, 126 S.Ct. 1330, 164 L.Ed.2d 47 (2006) our Supreme Court stated, *inter alia*, that a statement made in a

custodial setting would not be suppressed where the suspect "spontaneously 'blurts out'· the statement, ... or makes an incriminating statement in the course of 'small talk' with authorities, ... or is merely responding to biographical questioning,...." (internal citations omitted).

*Commonwealth v. Garvin,* 50 A.3d 694, 698 (Pa.Super.2012) (internal quotations and citations omitted).

 At the suppression hearing, the trial court heard testimony from Detective Robert Opferman. Opferman testified that he, along with Detective Ruckel, went to the Allegheny County Jail with an arrest warrant for Appellant in connection with Victim's homicide. N.T., 5/27/2009, at 17. The detectives then transported Appellant to Allegheny County police headquarters for "processing purposes." *Id.* Opferman testified, "We fill out an arrest report, get some biographical information." *Id.* The detectives placed Appellant at a desk in an interview room and "informed him that he was being arrested for the homicide of his daughter. At that point [Appellant] expressed an interest in speaking with [the detectives] about the incident." *Id.* at 17–18. The detectives informed Appellant that "if that was something that he was interested in doing [the detectives] would have to advise [Appellant] of his rights again." *Id.* at 18. At that point, Appellant signed a form waiving his *Miranda* rights. The interview was recorded, and during the course of that interview, Appellant admitted that he kicked Victim in "her private," she began bleeding, then he got scared and took her outside and left her wrapped in a blanket near Hawkins Village. Transcript of Appellant's Recorded Statement, 2/7/2007, at 1–2.

Detective Opferman's testimony supports the trial court's conclusion that Appellant was not subjected to custodial interrogation at the time he made the inculpatory statements. Rather, the statements were volunteered by Appellant.

 Even *if* the statements were not volunteered by Appellant, Appellant still knowingly and intelligently waived his *Miranda* rights when he signed a form and orally acknowledged that he understood his rights and wanted to speak with police.

The determination [of] whether an accused has knowingly and voluntarily waived his constitutional rights depends on the facts of each particular case. These circumstances include the background, experience, and conduct of the accused. The government has the burden to prove, by a preponderance of the evidence, that the waiver was the product of a free and deliberate choice rather than intimidation, coercion, or deception and was made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the constitutional rights to counsel have been waived. With respect to constitutional rights, courts should indulge every reasonable presumption against waiver..

*Commonwealth v. Cohen,* 53 A.3d 882, 886–87 (Pa.Super.2012) (quoting *Commonwealth v. Hill,* 42 A.3d 1085, 1091–92 (Pa.Super.2012)) (internal quotations and citations omitted).

Instantly, it is uncontroverted that on the afternoon of February 6, 2007, during police questioning, Appellant did invoke his right to counsel. At that time, Appellant was in custody for the indecent assault

charges related to X.H., and the detectives went to the Allegheny County Jail for the purpose of taking Appellant to police head-quarters to question Appellant again about the death of Victim. Appellant was advised of his *Miranda* rights, which he waived, and the detectives began questioning him. Opferman testified that

> [when] we began to ask [Appellant] about some discrepancies regarding some things that were findings in the autopsy, [Appellant] became irritated and enraged. At that point he yelled that he didn't want to talk to us anymore and he wanted to speak to an attorney.

N.T., 5/29/2007, at 16.

The detectives terminated the interview at that point. This episode shows that Appellant knew what his rights were, how he could invoke them, and that the police would immediately stop questioning him. Accordingly, we agree with the trial court that Appellant "knowingly, intelligently, and voluntarily waived [his] rights when he talked to police." Trial Court Opinion, 10/18/2011, at 30. As such, Appellant is not entitled to relief on this issue.

 Next, Appellant contends that the trial court erred when it denied Appellant's motion to sever the cases regarding X.H. and Victim. Specifically, Appellant contends that "even though the events were alleged to have occurred on the same night[,]" "given the nature of the charges, the extreme publicity of the case, and the salacious facts involved in each situation, the cumulative nature of the evidence was unduly prejudicial" to Appellant. Appellant's Brief at 39.

> Appellate review of a trial court's denial of a motion for severance is as follows: A motion for severance is addressed to the sound discretion of the trial court, and ... its decision will not be disturbed absent a manifest abuse of discretion. The critical consideration is whether the appellant was prejudiced by the trial court's decision not to sever. The appellant bears the burden of establishing such prejudice.

*Commonwealth v. Mollett*, 5 A.3d 291, 305 (Pa.Super.2010) (internal quotation omitted). Our Rules of Criminal Procedure provide:

> (1) Offenses charged in separate indictments or informations may be tried together if:
>
> > (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
> >
> > (b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582. Furthermore, "[t]he court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583.

Instantly, the trial court concluded that

> [Appellant] has failed to meet his burden of establishing how he would. have been prejudiced by the failure to sever these two crimes. The crimes arose out of the same occurrence and were temporally related. It was important for the jury to understand the factual sequence with respect to these particular charges since they were so inter-related. The Commonwealth's theory of presenting its case was that [Appellant] committed the offenses as a result of his sexual frustration. [Appellant] acknowledged that he used the basement area which he referred to as his dungeon, so that he could watch pornographic movies and masturbate. [Appellant] also maintained that in the late evening of February 2, 2007, that he and [D.R.] engaged

in sexual intercourse. [D.R.] denied this stating that [Appellant] wanted to engage in anal intercourse and that she refused to do so since she was eight months pregnant and she had strained a muscle in her lower back that made it uncomfortable for her to engage in any type of sexual activity. The Commonwealth proved that [Appellant] left his bedroom to go into the bedroom shared by [X.H.] and [Victim] and that he laid down next to [X.H.] and then put his hand on his "balls," which term [X.H.] took to mean his penis. After [Appellant] had sexually assault[ed] [X.H.], he then took [Victim] to the basement where he sexually assaulted her and then took her out into the frigid night and left her to freeze to death.

It was important for the jury to understand this timeline and also the possible motivations for [Appellant's] actions. While [the trial court] initially granted the motion for severance, it did so on a very limited understanding of the facts in [Appellant's] case. At the point in time that the motion to sever was granted, [the trial court] only had the benefit of the Court file and did not understand the whole scope of [Appellant's] sexual desires and urges. When the Commonwealth filed [its] reconsideration of the motion to sever, it explained in detail what it intended to prove and how it intended to do so. Based upon that information, [the trial court] reconsidered its decision, as it believed that it would be proper to have the two sexual crimes tried together since [Appellant] could not establish how he could be prejudiced by their joint trial.

Trial Court Opinion, 10/18/2011, at 14–16.

Based on the aforementioned reasoning, we conclude that the trial court did not abuse its discretion in denying the motion to sever. The instant case is analogous to *Commonwealth v. Wholaver*, 605 Pa. 325, 989 A.2d 883 (2010). In that case, the appellant was charged with multiple counts of sexual assault involving his daughters. Several weeks before trial on those charges, the appellant shot and killed his wife and daughters. The Commonwealth consolidated the sexual assault and murder cases. Subsequently, the appellant moved to sever the cases arguing that the consolidation was unduly prejudicial. The trial court denied the motion, and the cases were tried together. The appellant was convicted of the murder-related charges, but acquitted of the sexual assault charges. On appeal, the appellant argued that the trial court erred in denying the motion to sever. Our Supreme Court disagreed, reasoning, *inter alia,* that "because the charges all flowed from the same events and were part of the same story, joinder for trial was appropriate." *Id.* at 899. Thus, the trial court did not abuse its discretion in that case.

■ Likewise, in this case, the Commonwealth needed the testimony of D.R. and X.H. to tell the story of what happened to Victim on the night she disappeared, as well as establish Appellant's motive. Furthermore, it was evident in this case, as in *Wholaver, supra,* that the jury was able to distinguish between the two cases, because it was unable to reach a unanimous verdict on the charges involving X.H. Accordingly, we cannot see how Appellant was prejudiced by having the cases tried together. Thus, he is not entitled to relief.

■ Finally, Appellant argues that the trial court erred in allowing Dr. Mary Carrasco to testify on behalf of the Commonwealth. Dr. Carrasco is a Clinical Associate Professor of Pediatrics at the University of Pittsburgh School of Medicine, Assistant Professor of Behavior and Community Health at the Graduate School of

Public Health at the University of Pittsburgh, and she is also employed by the Pittsburgh Mercy Health System as the director of A Child's Place at Mercy, which is a "unit ... that focuses on the evaluation of suspected abuse and neglect." N.T., 3/16/2010, Vol. II, at 292. Dr. Carrasco testified as an expert in the field of pediatrics and, more specifically, suspected sexual abuse. She stated to a reasonable degree of medical certainty that Victim suffered a penetrating injury to her vaginal area. *Id.* at 335, 989 A.2d 883. Appellant contends that Dr. Carrasco should not have been allowed to testify to this conclusion because she is an expert on sexual abuse and not on the condition of a dead body. Appellant's Brief at 46.

■■■ Our standard of review is as follows:

[T]he admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or illwill, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Szakal*, 50 A.3d 210, 227 (Pa.Super.2012) (quoting *Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038, 1046 (2003)). The admissibility of an expert opinion is governed by Rule 702 of the Pennsylvania Rules of Evidence.

**Rule 702. Testimony by experts**

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may

testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.

Instantly, the trial court concluded that "it is clear that Dr. Carrasco had the expertise and knowledge to supplement the autopsy findings after it became apparent that [Victim] was the victim of sexual abuse." Trial Court Opinion, 10/18/2011, at 18. We agree.

■■■ "The purpose of expert testimony is to assist the factfinder in grasping complex issues not within the knowledge, intelligence, and experience of the ordinary layman. Where a witness has a reasonable pretension to specialized knowledge on a subject matter under investigation, the witness may testify as an expert and the weight to be given such testimony is for the jury to decide." *Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605, 621 (2001). Instantly, Dr. Carrasco testified that she has consulted on autopsies for the Allegheny County Coroner's Office and Medical Examiner's Office. N.T., 3/16/2010, Vol. II, at 307. She testified that she is called in

when there is a concern about child abuse but very often when there is concern about child sexual abuse because often there are specific techniques that I use in the examination that the coroner's office may not be familiar with and they prefer you to be there to evaluate the child if possible.

*Id.* at 307–8. Although Dr. Carrasco was not consulted on this particular autopsy, she was still qualified to offer her opinion; then, it was left to the jury to determine how much weight to assign the testimony. Accordingly, we find no error in the trial court's admission of Dr. Carrasco as an expert.

Based on the foregoing, and finding no error, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.