J-A19033-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL SCHNEIDER, | : | |
| | : | |
| Appellant | : | No. 974 WDA 2014 |

Appeal from the Judgment of Sentence entered on June 11, 2014
in the Court of Common Pleas of Allegheny County,
Criminal Division, No. CP-02-CR-0000824-2013

BEFORE: BENDER, P.J.E., JENKINS and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                    **FILED JULY 29, 2015**

Michael Schneider ("Schneider") appeals from the judgment of sentence imposed following his conviction of possession with intent to deliver a controlled substance ("PWID") and possession of a controlled substance.[1] After thorough review of the relevant law, we affirm.

The trial court set forth the facts underlying this appeal as follows:

> On the evening of October 8, 2012, Detective Edward Fallert ["Detective Fallert"], a twenty[-]year veteran of the Pittsburgh Police Department[,] and a narcotics detective for the last thirteen [] years, was on undercover patrol in the Basin Street area of the City of Pittsburgh[,] with six [] other plain-clothed detectives. ([N.T., 9/12/13 (suppression hearing), at] 4, 7-8). The Basin Street area is considered to be a "high crime area" because of the large volume of drug sales that take place there. ([*Id.* at] 9). The area is also the subject of continuing complaints by the public to both the Mayor's complaint line and the police department. ([*Id.*]). Additionally, one of the biggest drug arrests of Detective Fallert's career took place in that

---

[1] **See** 35 P.S. § 780-113(a)(30) and (16).

location, which involved him seizing over ten [] kilograms of cocaine and $100,000 [in cash]. ([*Id.*]).

On the evening in question, the group of seven [] plain-clothed detectives were driving down Basin Street in two unmarked police vehicles. ([*Id.* at] 8). Detective Fallert was driving the lead vehicle[,] and had three [] other detectives in the car with him. ([*Id.*]). At approximately 6:15 p.m., Detective Fallert noticed [Schneider] walking alone[,] on the right side of the sidewalk, towards the police vehicles. ([*Id.* at] 9-10). The vehicles were on a "small, narrow" street, and the spacing was such that "two cars can barely pass if they were going side by side." ([*Id.* at] 10). As [Schneider] approached his vehicle, Detective Fallert "noticed that his front hooded sweatshirt pocket was weighted down in the center and appeared to be like flopping as he walked." ([*Id.* at] 11). At first, Detective Fallert did not "think anything" of it, but he decided to "pay closer attention to him." ([*Id.*]).

Detective Fallert drove closer to [Schneider], and the two [] men made eye contact. ([*Id.* at] 12). Upon making eye contact, Detective Fallert saw [Schneider] "hurriedly put his hand into his pocket[2] and push[] his pocket close to his person, to his stomach, waistband." ([*Id.* at] 11[]). Detective Fallert was [] within five [] to ten [] feet of [Schneider] when he observed him press [his hoodie pocket] against his torso. ([*Id.* at] 11-12). Detective Fallert slowly drove past [Schneider] and instructed the officers behind him to keep an eye on [Schneider] because he believed that [Schneider] might be carrying a weapon. ([*Id.*]). As he drove past [Schneider], Detective Fallert noticed that [Schneider] was looking around and looking back over his shoulder in the direction of the unmarked police vehicles. ([*Id.* at] 13). Although the vehicles were unmarked, they were "equipped with light bars, which are visible from the exterior through the front windshield and through the side windows." ([*Id.* at] 8). The windows of the vehicles were not tinted, which made it possible for an individual to view the interior light bar from the outside. ([*Id.* at] 12).

Detective Fallert saw [Schneider] make a left turn out of his view, and moments later[,] he was informed by the detectives in the vehicle behind him that [Schneider] "had taken

---

[2] Detective Fallert was referring to the front pocket of Schneider's hooded sweatshirt (or "hoodie"). *See* N.T., 9/12/13, at 11.

off running." ([*Id.*]). Upon seeing [Schneider] take flight, the officers gave chase and eventually apprehended him. ([*Id.* at] 15). Given their suspicion that [Schneider] was potentially armed and dangerous, the officers searched him for weapons and recovered, instead, approximately [1.3 ounces] of crack cocaine. ([*Id.*]).[3]

Trial Court Opinion, 12/3/14, at 3-5 (footnotes added, footnote in original omitted).

Following Schneider's arrest, the Commonwealth charged him with PWID and possession of a controlled substance. Schneider subsequently filed a Motion to suppress the cocaine discarded during the police chase, asserting that such evidence was inadmissible because he had abandoned it during an unlawful seizure that was unsupported by reasonable suspicion. Upon the conclusion of the suppression hearing on September 12, 2013, the suppression court denied Schneider's Motion, determining that the police possessed articulable reasonable suspicion that Schneider was engaged in unlawful activity, sufficient to support the investigative detention. Schneider filed a Motion for reconsideration of the trial court's ruling, which the trial court denied.

The matter proceeded to a non-jury trial, at the close of which the trial court found Schneider guilty of PWID and possession of a controlled

---

[3] While Schneider was fleeing, one of the officers giving chase observed Schneider throw a clear bag containing a white, powdery substance onto the ground. N.T., 3/21/14 (trial), at 10. After apprehending Schneider, the police recovered two baggies of cocaine on the ground nearby Schneider. *Id.* at 10-11. The police also recovered two cell phones and $1,840 in U.S. currency from Schneider's pants pockets. *Id.* at 10. No weapon was found on Schneider's person or in the general vicinity. *Id.* at 11.

substance. On June 11, 2014, the trial court sentenced Schneider to serve nine to eighteen months in the Allegheny County Jail, and five years of probation. Schneider filed a timely Notice of Appeal. In response, the trial court ordered him to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Schneider timely filed a Concise Statement.

On appeal, Schneider presents the following issue for our review: "Was the evidence sufficient to support the conclusion that the police had a reasonable suspicion of criminal activity (gun possession), so as to justify an investigatory stop of [Schneider]?" Brief for Appellant at 4.

In reviewing a challenge to a trial court's denial of a motion to suppress, "[o]ur standard of review … is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Kearney*, 92 A.3d 51, 65 (Pa. Super. 2014). "In making this determination, we may consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted." *Commonwealth v. Page*, 59 A.3d 1118, 1131 (Pa. Super. 2013) (citation omitted).

> Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment of the United States Constitution afford protections against unreasonable searches and seizures. Among the protections is the requirement that an officer have reasonable suspicion before an investigatory stop.
>
> Our [Pennsylvania S]upreme [C]ourt has interpreted [the] Article I, § 8 protection more broadly than the Fourth Amendment[,] and has found that a seizure occurs when an

- 4 -

officer gives chase. Under Pennsylvania law, any items abandoned by an individual under pursuit are considered fruits of a seizure. Those items may only be received in evidence when an officer, before giving chase, has at least the reasonable suspicion necessary for an investigatory stop. …

In deciding whether reasonable suspicion exists for an investigatory stop, our analysis is the same under both Article I, § 8 and the Fourth Amendment. The fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate. This assessment, like that applicable to the determination of probable cause, requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in terms of both quantity or content and reliability.

*Commonwealth v. Taggart*, 997 A.2d 1189, 1193 (Pa. Super. 2010) (citation and brackets omitted).

Schneider argues that the police had no lawful authority to seize him[4] because the facts failed to establish the reasonable suspicion that criminal activity was afoot necessary to justify the investigative detention. Brief for Appellant at 9 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). According to Schneider, the police pursued and seized him based *solely* upon his flight from the area. Brief for Appellant at 10. Schneider does not dispute that the area in question was a known high crime area. However, he correctly observes that presence in a high crime area, by itself, is not enough to give rise to reasonable suspicion. *Id.* at 12 (citing *Commonwealth v. Key*, 789 A.2d 282, 289 (Pa. Super. 2001) (stating that "[t]he fact that [a]ppellant

---

[4] It is undisputed that the police seized Schneider when they chased him upon his fleeing the area. *See Taggart, supra*.

was merely present in a 'high crime area' in no way establishes his involvement in criminal activity.")); **see also In re D.M. II**, 781 A.2d 1161, 1163 (Pa. 2001) (stating that "mere presence in a high crime area [is] insufficient to support a finding of reasonable suspicion."). Additionally, Schneider argues that "[t]he case law in Pennsylvania has been consistent in holding that flight alone is insufficient to give a police officer reasonable suspicion of criminal activity." Brief for Appellant at 10-11 (citing **Taggart**, 997 A.2d at 1193 (stating that "[f]light by the suspect can be considered suspicious activity, but flight alone does not give rise to reasonable suspicion.")). Finally, Schneider challenges Detective Fallert's testimony that he reasonably suspected that Schneider was carrying a firearm. Brief for Appellant at 14 (arguing that "[t]here is no discussion … as to how … an object weighing only 1.3 ounces[, *i.e.*, the weight of the cocaine recovered,] can be transformed into a reasonable suspicion that [Schneider was] illegally carrying a firearm.").

In **Illinois v. Wardlow**, 528 U.S. 119 (2000), which is directly on-point to the instant case, the United States Supreme Court held that a police officer is justified in reasonably suspecting that an individual is involved in criminal activity when that individual (1) is present in a high crime area; and (2) engages in unprovoked, headlong flight after noticing the police. **Id.** at

124-25.[5] The Supreme Court ruled that the existence, in combination, of these two factors alone is sufficient to establish reasonable suspicion. *Id.* Our Pennsylvania Supreme Court subsequently recognized the significance of the *Wardlow* holding, stating that "it is evident that unprovoked[6] flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment." *D.M. II*, 781 A.2d at 1164 (footnote added); *see also id.* at 1165 n.2 (applying *Wardlow* and declining to adopt greater state constitutional rights). Later, this Court clarified that, in order for the holdings of *Wardlow* and *D.M. II* to apply, it must be established that (1) "the incident took place in a high crime area[; and (2)] the suspect fled upon being confronted by the police or r*ecognizing police presence in the immediate area*." ***Commonwealth v. Washington***, 51 A.3d 895, 898 (Pa. Super. 2012) (emphasis added); *see also id.* (stating

---

[5] In *Wardlow*, a four-car police caravan was investigating drug activity in an area of Chicago known for heavy narcotics trafficking. *Wardlow*, 528 U.S. at 121. One of the officers observed the defendant holding an opaque bag. *Id.* The officers did not observe any specific indications that the defendant was in possession of contraband. *See id.* When the defendant saw the police, he immediately fled. *Id.* at 122. The police apprehended him and, during a pat-down search for weapons, recovered a gun. *Id.* The Supreme Court affirmed the denial of the defendant's motion to suppress, reversing the decisions to the contrary by the Illinois courts of appeal. *Id.* at 122-24.

[6] Neither the Court in *D.M. II* nor the *Wardlow* Court made a distinction between "unprovoked" and "provoked" flight. It appears that their inclusion of the term unprovoked is merely superfluous. Indeed, it is clear that it is flight *provoked* by a defendant's mere sighting of police that is the relevant factor, as it is a suspect's flight and attempted avoidance of police that increases the degree of suspicion of the suspect's involvement in criminal activity.

that "the suspect must know he is running from law enforcement before a reasonable suspicion can attach.").

Here, it is undisputed that the incident took place in a high crime area, and Schneider fled upon the arrival of the undercover officers at the scene. Accordingly, in determining whether these two factors, in conjunction, established reasonable suspicion under **Wardlow** and its progeny, all that must be established is that Schneider knew that he was running from police, pursuant to **Washington, supra**.

Schneider contends that "the notion that [he] was running from the police is somewhat based on conjecture[,]" pointing out that (1) both of the police vehicles were unmarked; (2) all of the officers were in plainclothes; and (3) none of the officers identified themselves as police before Schneider began to run. Brief for Appellant at 14.

Examining the totality of the facts in the light most favorable to the Commonwealth, as our standard of review requires, we conclude that the circumstantial evidence establishes that Schneider knew that he was running from the police. Specifically, (1) Schneider made eye contact with Detective Fallert; (2) immediately thereafter, Schneider "hurriedly put his hand into his pocket and pushed his pocket close to his person[,]" which aroused Detective Fallert's suspicion; (3) after the police drove past Schneider, Schneider repeatedly looked back over his shoulder in the direction of the unmarked police vehicles; (4) Schneider then "immediately changed direction" and began running; and (5) though the police vehicles were

unmarked, they were equipped with police light bars, and Schneider was in a position to see the light bars and identify the vehicles as police vehicles.

Additionally, we determine that the cases Schneider relies upon, **Taggart, supra**; **Key, supra**; and **In the Interest of M.D.**, 781 A.2d 192 (Pa. Super. 2001), are factually distinguishable and unavailing. **See** Trial Court Opinion, 12/3/14, at 8-12 (distinguishing **Taggart**, **Key**, and **M.D.**). None of those cases involved flight from a high crime area, as here.

Finally, Schneider misses the point in attempting to minimize the suspicious nature of his behavior. **See Commonwealth v. Davis**, 102 A.3d 996, 1000 (Pa. Super. 2014) (stating that "reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further.") (citation omitted). Indeed, Schneider's flight from police in a high crime area, absent more, was sufficient to establish reasonable suspicion. **See Wardlow, supra** (holding that the defendant's flight from police in a high crime area established reasonable suspicion, where the police did not articulate any specific indications that the defendant possessed contraband (aside from his mere possession of an opaque bag)). Moreover, Schneider's furtive movements to conceal an object in his front hoodie pocket, when seen by police, enhanced the reasonable suspicion present. **See Commonwealth v. Cottman**, 764 A.2d 595, 599-600 (Pa. Super. 2000) (holding that the defendant's presence in a high crime area, his furtive movement to conceal an object when seen by police, and his flight established reasonable suspicion). Although Detective

Fallert did not see the item that Schneider was allegedly concealing in his hoodie pocket, based on Detective Fallert's specialized training and experience, Schneider's suspicious behaviors suggested that he possessed illegal contraband. *See id.* at 600; *see also* Trial Court Opinion, 12/3/14, at 12 (stating that "Detective Fallert, a twenty[-]year veteran of the police force who had received extensive narcotics and firearm training, observed that [Schneider] exhibited behaviors that were consistent with an individual who was attempting to conceal a firearm.").

Accordingly, based upon the foregoing, we reject Schneider's claim that the suppression court erred by denying his Motion to suppress. The totality of the circumstances demonstrate that the police officers, in fact, had reasonable suspicion to believe that Schneider was engaged in criminal activity when they began their pursuit of him following his flight in a high crime area. *See Wardlow, supra*.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/29/2015