J-S75029-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ARKEL T. GARCIA | |
| Appellant | No. 1874 EDA 2015 |

Appeal from the Judgment of Sentence March 26, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003438-2014

BEFORE:  BOWES, J., MOULTON, J., and MUSMANNO, J.

MEMORANDUM BY MOULTON, J.:                    **FILED APRIL 27, 2017**

Arkel T. Garcia appeals from the March 26, 2015 judgment of sentence entered in the Philadelphia County Court of Common Pleas following his jury trial convictions for second-degree murder, robbery, and carrying a firearm without a license.[1]  We affirm.

On November 30, 2013, at approximately 4:48 p.m., Casey Massey was shot in an alley behind 5850 Lebanon Avenue in Philadelphia.  N.T., 2/11/2015, at 9, 20, 23 ("Tr. Trs. I").  Police arrived at the scene, and Massey, who ultimately died as a result of the gunshot wounds, answered approximately 15 of their questions during the ambulance ride to the hospital.  *Id.* at 30.  Massey stated that he was walking down the alley when

_____

[1] 18 Pa.C.S. §§ 2502(b), 3701(a)(1)(i), and 6106(a), respectively.

someone approached from behind and grabbed his headphones. *Id.* When Massey attempted to retrieve the headphones, someone shot him. *Id.* Massey did not see "any faces" and felt only one set of hands. *Id.* at 30-31.

Detective Philip Nordo was assigned to investigate Massey's death. N.T., 1/22/2015, at 9 ("Suppression Hr'g."). Detective Nordo obtained a video taken from surveillance cameras overlooking the alley and showed the video to a confidential informant. *Id.* at 15. The informant said that the figure in the video looked like Garcia or another individual, *id.*,[2] and that Garcia was "robbing people in the neighborhood," *id.* at 15-16.[3] Detective Nordo informed police officers Ronald Burgess and Donald Ryder that he would like to speak with Garcia and the other individual, and requested that the officers ask them to come to the Homicide Unit to talk. *Id.* at 16.

On Saturday, December 7, 2013, Officers Burgess and Ryder were on patrol wearing plain clothes and driving an unmarked police car. Suppression Hr'g. at 79-80, 88. At approximately 1:20 p.m., Officer Burgess saw Garcia at a bus stop on the corner of 54th and Lebanon Streets. *Id.* at 80. Officer Burgess knew Garcia and had what he called a "working

_____

[2] Detective Nordo testified that he "couldn't tell" who was in the video "because I'm not from there. Again, if it was somebody else that I knew personally, I might be able to say, oh, that's so and so." Suppression Hr'g. at 52.

[3] The informant did not testify at either the suppression hearing or trial, nor did anyone testify to the informant's basis of knowledge or reliability.

relationship" with him. *Id.* Officer Burgess informed Garcia that the homicide detectives wanted to speak with him. *Id.* at 81. Garcia agreed to go to the Homicide Unit. *Id.* Officer Burgess did not handcuff Garcia; he brought Garcia through the front door of the Homicide Unit, rather than through the sally port, which is where the police would ordinarily bring an arrestee; and Officer Burgess signed Garcia into the unit as a witness at 2:02 p.m. *Id.* at 81, 83. Officer Burgess testified that Garcia was "fully cooperative." *Id.* at 84.

Officer Burgess then attempted to contact Detective Nordo, who was off duty, but was unable to do so. *Id.* at 84-85. Officer Burgess testified that Garcia did not ask to go home or to speak with anyone, *id.* at 88, and that Garcia was free to leave, *id.* at 90. However, when asked whether he had informed Garcia that he could leave, Officer Burgess effectively admitted that he had not, stating "[h]e never asked me." *Id.* Officer Burgess explained that he spent only about 15 minutes with Garcia after bringing him into the Homicide Unit, and that he left him seated on a bench, without handcuffs, in the "front room" of the unit. *Id.* at 91. Officer Burgess then left the Homicide Unit to return to patrol and had no further contact with Garcia. *Id.* at 92. While describing his entire interaction with Garcia as "very casual," Officer Burgess conceded that Garcia could not have left the Homicide Unit unless someone buzzed him out or escorted him out. *Id.* at 92.

Detective Nordo testified that he did not become aware that Garcia was at the Homicide Unit until between 8:00 p.m. and 10:00 p.m. on December 7, 2013, *id.* at 17, 43, roughly six hours or more after Officer Burgess had returned to patrol. Detective Nordo did not arrive at the Homicide Unit until approximately 10:15 a.m. the following day, December 8, 2013. *Id.* at 18.[4] Detective Nordo testified that the officers had arranged for Garcia to remain at the Homicide Unit until he arrived. *Id.* at 17-18.

Detective Nordo had no first-hand knowledge of Garcia's location or treatment at the Homicide Unit from the time of Garcia's arrival on Saturday afternoon until Detective Nordo's arrival on Sunday morning, roughly 21 hours later. *Id.* at 17-18, 38, 40-42, 44-51. His understanding, based on conversations with unspecified fellow officers, was that Garcia was initially in the vestibule area of the Homicide Unit, seated on a bench. *Id.* at 41. By the time Detective Nordo arrived, however, he found Garcia in a windowless interview room. *Id.* at 41-42. Detective Nordo did not know of any attempts by other officers or detectives to speak with Garcia prior to his arrival. *Id.* at 42. Detective Nordo did not consider having someone ask Garcia to return to the unit at a later time because:

> we didn't know if we were ever going to have this encounter again. And I knew I was going to at some point

---

[4] Detective Nordo explained that he needed to request and receive authorization to work on December 8, 2013, which was a scheduled day off for him. Suppression Hr'g. at 18, 43-44.

get some permission to come in and speak with him. I was hoping to get some permission to come in a little earlier than I did. I mean, that's just the way it happened. It was a chance.

*Id.* at 43-44.

Detective Nordo believed that an officer had explained to Garcia that: the detectives investigating the crime were not at the unit; the officers were attempting to contact the detectives; and the detectives wanted to talk to him about the homicide. *Id.* at 46. Detective Nordo described his understanding of Garcia's position as: "well, I didn't kill nobody, so I have no problem making that very clear to the police." *Id.* Detective Nordo did not know whether Garcia had made any requests to see family members or whether he had asked to see an attorney. *Id.* at 46-47. Detective Nordo was unsure whether Garcia had had any food or drink from his arrival at the police station until the time Detective Nordo brought him food the next morning. *Id.* at 49-50. According to Detective Nordo, Garcia slept on a table inside the interview room on the night of December 7, 2013. *Id.* at 50. The record does not reflect how or when Garcia was moved to the interview room, or whether the interview room was locked.

When Detective Nordo arrived, he sat down with Garcia in an interview room but then moved to an office. *Id.* at 18-19. Detective Nordo brought food from Wawa, which Garcia ate. *Id.* at 19-20.

At approximately 12:10 p.m., Detective Nordo stepped out of the room to read the case file and view the video. *Id.* at 21. At approximately 1:25 p.m., he and Detective Nathan Williams resumed speaking with

Garcia.[5] *Id.* at 21. Garcia began discussing his acquaintances, "Leek" and "E". *Id.* at 22. Garcia told the detectives that "Leek" and "E" "wanted to rob this guy and all [Garcia] did was accompany them." *Id.*[6] Garcia said they met the victim at the 59th Street Minimarket and discussed "the direction the victim was coming in and going to and how these two brothers went down the alleyway and committed such an act and so forth." *Id.* at 22-23. The detectives took a break from the interview and discussed how Garcia's description of the event did not comport with the events as seen on the video. *Id.* at 23. For example, the victim and the robber were never inside the 59th Street Minimarket, as Garcia claimed, and there appeared to be only one perpetrator, not three. *Id.* at 23, 68-69.

Detective Nordo testified that at approximately 2:30 p.m. on December 8, 2013, he read Garcia his *Miranda*[7] rights, because Garcia had

---

[5] Detective Nordo told Garcia that he wanted to talk about a murder at the 5800 block of Lebanon Avenue and said: "[Y]ou're from the neighborhood, you're out there, and we wanted to know if you had any information about that crime." Suppression Hr'g. at 51. At this point, Detective Nordo did not tell Garcia that he was a suspect. *Id.*

[6] The police investigated "Leek" and "E," but cleared them of any involvement in the crime. Tr. Trs. I at 181-85. The police met "E," who was wearing a colostomy bag and moving sluggishly. N.T., 2/12/2015, at 83-84 ("Tr. Trs. II"). He had been shot in the stomach on October 20, 2013, which resulted in respiratory failure, multiple surgeries, and a re-sectioned abdomen. *Id.* at 87-88. The hospital released him on November 4, 2013. *Id.* at 88.

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

become a possible suspect. *Id.* at 23-24. Garcia stated that he understood his rights, noting he had been arrested on prior occasions. *Id.* at 25. At 2:45 p.m., Garcia received a question-and-answer form containing the *Miranda* rights. *Id.* at 28-29. Detective Nordo recorded Garcia's answers on the form, and Garcia reviewed, signed, and dated it. *Id.* Garcia then provided background information, including that he had been staying with his aunt at 5401 Lebanon Street following the murder. *Id.* at 30.

At around 4:05 p.m., Garcia gave a formal statement. *Id.* at 30. In the statement, he confirmed he had something to eat and drink after meeting Detective Nordo on the morning of December 8, 2013, and that someone had explained to him that Detective Nordo was not working on December 7, 2013. Investigation Interview Record at 1, Cmwlth. Exh. C-27. Detective Nordo asked Garcia whether he understood the rights read to him and whether he understood that he did not have to speak with Detective Nordo. *Id.* at 2. Garcia responded: "Yes I understand. But I didn't kill anyone and I want to do what you said to me and clear my name." *Id.* Garcia also stated that Leek "shot three times at the dude," *id.* at 3, and that the weapon was Leek's ".380," *id.* at 4. At approximately, 7:30 p.m., Garcia adopted the statement and verified that the statements contained therein were true and correct. Suppression Hr'g. at 32-33. Garcia's written statement was generally consistent with the version of events he previously provided. Garcia also identified photographs of Leek and E. *Id.* at 34.

Garcia then signed a consent to videotape statement and provided a video statement. *Id.* at 33, 35.

The police formally placed Garcia under arrest. Tr. Trs. I at 184-85. Four days later, on December 12, Garcia called Aneesah Young from prison and said, "I told you I was fucking with them, see if they had it on me. They don't got shit on me. I'm going to spank this jawn." Tr. Trs. II at 200.

On January 22, 2015, Garcia filed a motion to suppress statements he made to police officers on December 8, 2013, arguing that Garcia was arrested at 2:00 p.m. on December 7, 2013, when Officer Burgess picked him up and transported him to the homicide unit. Mot. to Suppress at ¶ 1. He argued that the statements provided were not voluntary and that the police violated his due process rights because the police held him for more than 24 hours without formally charging him with a crime and because they denied him access to his family or an attorney. *Id.* at ¶¶ 2, 8. He further argued that the police failed to advise him of his *Miranda* rights prior to questioning him. *Id.* at ¶ 4. After hearing the testimony outlined above, the trial court denied the motion.

At trial, the jury heard testimony from the police officers and detectives involved with the case. Detective Nordo testified regarding the statements discussed above. He also testified that Garcia told the detectives that he had been at his aunt's house since the night of the murder because he "didn't want the cops to pick [him] up and . . . didn't want to get caught up in this." Tr. Trs. I at 168. Further, Garcia told the detectives he was

- 8 -

wearing the same clothes that he wore on the night of the murder, including boots that resembled the boots worn by the shooter in the video of the murder. *Id.* at 168, 172, 180. Garcia told Detective Nordo that Leek had a gun on the night of the robbery, a "[.]380," which he called his "pocket rocket." *Id.* at 170. At trial, Officer Gary Guaraldo testified that cartridge casings found at the scene were .380-caliber cartridges. Tr. Trs. II at 44, 46. The police officers obtained a search warrant for the property that Garcia claimed was his aunt's house and discovered it was an abandoned property. Tr. Trs. I at 180-81. Although there were individuals at the property, Garcia's aunt was not there. *Id.* at 181.

Officer Paul Johnson testified that, on route to the hospital, Massey told the officers that he was walking down the alleyway, listening to music, when someone came from behind and grabbed his headphones. *Id.* at 23-24. As he tried "to stop them, he could feel himself getting shot." *Id.* at 24. Massey fell, "[t]he guys got away," and they did not take the headphones. *Id.* Massey said that "all I felt was one person," but he was unable to give a description of the individual and did not "see any faces." *Id.* at 24, 30.

The jury also heard defense testimony from two alibi witnesses: Lakasha Hardee and Annesah Young. Hardee is Garcia's mother. She testified that Garcia lived in her home at 5870 Malvern Avenue at the time of the shooting. Tr. Trs. II at 102. Hardee stated she was in the kitchen between 4:45 p.m. and 5:00 p.m. on November 30, 2013, when she heard

three gunshots. *Id.* at 105-06. Her daughter, Garcia, and Garcia's friend were in the house, and, after Hardee called for him, Garcia came to the kitchen. *Id.* at 107, 109. She asked whether he had heard the shots, and he responded that he was sleepy and went to back to the basement. *Id.* at 109-110. Hardee testified that she saw Garcia during the week of November 30, 2013 to December 6, 2013. *Id.* at 117-18. Hardee also testified that she did not see Garcia on December 6, 2013, December 7, 2013, or December 8, 2013, but tried to reach him "numerous times." *Id.* at 119. She also called several police stations, the morgue, and two hospitals. *Id.* at 127. The Commonwealth challenged Hardee's credibility on cross-examination on various grounds, including that: (1) she informed the media[8] that Garcia was on the front porch watching movies at the time of the shooting, but later testified that she was incorrect when speaking with the media and that he was actually in the basement at the time of the shooting, *id.* at 137-38; and (2) after hearing a transcript of a telephone conversation with Garcia in which she told him that the person approaching the victim looked like Garcia, she admitted that "[i]f that's what the audio say I said, I did say it," *id.* at 166-67.

---

[8] Hardee contacted and was interviewed by the media following Garcia's arrest. She gave a televised interview.

Young testified that she was at Garcia's house from November 28, 2013 to December 1, 2013.  Tr. Trs. II at 170-72.  She testified that on November 30, 2013, between 4:45 p.m. and 5:00 p.m., she heard three gunshots.  *Id.* at 173-74.  Ms. Hardee then called Garcia's name, and Garcia ran from the basement to the kitchen.  *Id.*  at 174-75.

The parties also submitted stipulations, including a stipulation that Garcia did not have a valid permit to carry a firearm.  Tr. Trs. II at 92.

On February 17, 2015, the jury convicted Garcia of second-degree murder, robbery, and carrying a firearm without a license.  On March 26, 2015, the trial court sentenced Garcia to life imprisonment for the second-degree-murder conviction.  The court imposed no further sentence for the remaining convictions.

On April 3, 2015, Garcia filed a post-sentence motion, which the trial court denied on June 5, 2015.  On June 16, 2015, Garcia filed a notice of appeal.  Both Garcia and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925. Garcia raises the following issues on appeal:

> I. IS THE DEFENDANT IS ENTITLED TO AN ARREST OF JUDGMENT WITH RESPECT TO HIS CONVICTIONS FOR MURDER OF THE SECOND DEGREE, ROBBERY, AND CARRYING A FIREARM WITHOUT A LICENSE SINCE THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE VERDICTS OF GUILT AS THE COMMONWEALTH FAILED TO SUSTAIN ITS BURDEN OF PROVING THE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT[?]
>
> II. EVEN IF THE EVIDENCE WERE SUFFICIENT TO SUPPORT DEFENDANT'S CONVICTIONS, THE GUILTY VERDICTS WERE AGAINST THE WEIGHT OF THE EVIDENCE.

III. THE DEFENDANT IS ENTITLED TO A NEW TRIAL AS A RESULT OF THE TRIAL COURT'S DENIAL OF HIS MOTION FOR A MISTRIAL MADE DURING THE PROSECUTOR'S IMPROPER SUMMATION TO THE JURY.

IV. THE SUPPRESSION COURT IMPROPERLY DENIED DEFENDANT'S MOTION TO SUPPRESS HIS INCULPATORY STATEMENTS TO POLICE BECAUSE THE DETECTIVES ARRESTED AND DETAINED HIM IN THE HOMICIDE UNIT OVERNIGHT WITHOUT A WARRANT AND WITHOUT PROBABLE CAUSE.

1. AS A THRESHOLD MATTER, DEFENDANT'S DETENTION IN THE HOMICIDE UNIT CONSTITUTED AN ARREST OR A CUSTODIAL DETENTION THAT REQUIRED PROBABLE CAUSE.

2. UNDER THE TOTALITY OF CIRCUMSTANCES, DETECTIVES LACKED THE REQUISITE PROBABLE CAUSE TO ARREST DEFENDANT WITHOUT A WARRANT OR TO SUBJECT HIM TO CUSTODIAL DETENTION.

Garcia's Br. at 5.

## I.    **Sufficiency of the Evidence**

Garcia first challenges the sufficiency of the evidence.  We apply the following standard when reviewing a sufficiency of the evidence claim: "[W]hether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." **Commonwealth v. Lehman**, 820 A.2d 766, 772 (Pa.Super. 2003), *aff'd*, 870 A.2d 818 (Pa. 2005) (quoting **Commonwealth v. DiStefano**, 782 A.2d 574 (Pa.Super. 2001)).  In applying this standard, "we may not weigh the evidence and substitute our judgment for the fact-finder." **Id.**

Further, "the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Lehman*, 820 A.2d at 772 (quoting *DiStefano*, 782 A.2d at 574). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Id.* "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Id.*

In applying the above test, we must evaluate the entire record and consider all evidence actually received. *DiStefano*, 782 A.2d at 582. Further, "the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Id.*

Garcia claims that the Commonwealth failed to establish that he was the shooter, that he took or attempted to take property by force, that he fired a weapon, that he was responsible for the victim's death, or that the victim was killed during the course of a robbery. Garcia's Br. at 14. He asserts that the Commonwealth's evidence was "speculative, conjectural, and inherently unreliable and did not sustain the Commonwealth's burden beyond a reasonable doubt." *Id.* Garcia further claims that there was no physical evidence to establish that he was involved with the shooting and

robbery, that he stole the headphones, or that he was in the area at the time of the robbery. *Id.* at 15.

Contrary to Garcia's contention, the Commonwealth does not need to present physical evidence to establish, beyond a reasonable doubt, that Garcia was guilty of the crimes charged. *See, e.g., Commonwealth v. Cooper*, 941 A.2d 655, 662 (Pa. 2007) (courts "consider both direct and circumstantial evidence, cognizant that circumstantial evidence alone can be sufficient to prove every element of an offense"). The Commonwealth admitted into evidence Garcia's statements, in which he admitted to participating in the robbery that resulted in the murder, correctly stated that there had been three gunshots, and accurately described the caliber of the murder weapon. Further, the Commonwealth showed the video of the robbery and murder to the jury and presented evidence that Garcia owned the same distinctive boots as those worn by the killer in the video. In addition, Garcia called Young from prison and told her that he was "fucking" with the police to "see if they had it on me." The jury also heard Garcia's statement of his alleged minimal role in the robbery; saw how that story did not comport with the events as shown on the video; and heard evidence that "E" had a physical condition that would have prevented him from participating in the crime, as Garcia claimed he had. Further, Garcia and the Commonwealth entered a stipulation that Garcia did not have a valid permit to carry a firearm.

While the evidence may not have been overwhelming, it was sufficient to establish Garcia committed robbery, second-degree murder, and carrying a firearm without a license. The jury could have found beyond a reasonable doubt that Garcia inflicted serious bodily injury by shooting Massey while attempting to steal his headphones. 18 Pa.C.S. § 3701(a)(1)(i) (robbery occurs if a person, in the course of committing a theft, inflicts serious bodily injury upon another).[9] The jury also could have found beyond a reasonable doubt that Garcia committed second-degree murder, that is, that he killed Massey while engaging in the perpetration of a felony (robbery). **See** 18 Pa. C.S. § 2502(b). Further, the jury could have found, beyond a reasonable doubt, that Garcia was carrying a firearm without a license, as Massey was shot and Garcia and did not have a permit to carry a firearm. **See** 18 Pa.C.S. § 6106(a)(1). Accordingly, Garcia's sufficiency of the evidence claim fails.

## II. **Weight of the Evidence**

Garcia next argues that the verdict was against the weight of the evidence. A defendant must raise a claim challenging the weight of the evidence with the trial judge "in a motion for a new trial: (1) orally, on the

---

[9] "An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S. § 3701(a)(2). A person commits the crime of "theft by unlawful taking" if he unlawfully takes the movable property of another with intent to deprive him thereof. 18 Pa.C.S. § 3921(a).

record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A). A defendant waives a weight challenge if he fails to raise it before the trial court. *Commonwealth v. Sherwood*, 982 A.2d 483, 494 (Pa. 2009). Garcia waived his weight of the evidence claim, because he failed to raise it before sentencing, at sentencing, or in a post-sentence motion.

Even if Garcia had preserved his weight of the evidence challenge, the claim would fail. This court reviews a weight of the evidence claim for an abuse of discretion. *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Id.* (quoting *Commonwealth v. Widmer* 744 A.2d 745, 753 (Pa. 2000)). "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." *Id.*

A trial court should not grant a motion for a new trial "because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Clay*, 64 A.3d at 1055. "Rather, 'the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give

them equal weight with all the facts is to deny justice.'" ***Id.*** (quoting ***Widmer***, 744 A.2d at 752). Courts have stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Id.*** (quoting ***Commonwealth v. Brown***, 648 A.2d 1177, 1089 (Pa. 1994)).

Garcia claims the verdict was against the weight of the evidence because: (1) the only evidence connecting him to the crime was Detective Nordo's "feeling" that Garcia was providing incorrect information; (2) there was no physical evidence connecting him to the crime; and (3) he presented alibi witnesses. Appellant's Br. at 17-18. However, as discussed above, the Commonwealth established Garcia's guilt for the crimes beyond a reasonable doubt. Although Garcia presented alibi testimony, the jury was free to credit the Commonwealth's evidence linking him to the crime and to reject his alibi witnesses' testimony. ***See Commonwealth v. Page***, 59 A.3d 1118, 1130 (Pa.Super. 2013) (credibility determination "lies solely within the province of the factfinder"); ***Commonwealth v. DeJesus***, 860 A.2d 102, 107 (Pa. 2004) ("The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses."). The trial court did not abuse its discretion when it found the verdict was not against the weight of the evidence. ***See*** 1925(a) Op. at 38-41.

## III.  **Prosecutorial Misconduct**

Garcia next claims that the trial court erred in denying his motion for a mistrial due to the prosecutor's improper summation to the jury.  We apply the following standard when reviewing a denial of a mistrial:

> A motion for a mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, our standard of review is whether the trial court abused that discretion.

**Commonwealth v. Caldwell**, 117 A.3d 763, 774 (Pa.Super. 2015) (*en banc*) (quoting **Commonwealth v. Akbar**, 91 A.3d 227, 236 (Pa.Super. 2014)).

"[A] prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence."  **Caldwell**, 117 A.3d at 774 (quoting **Commonwealth v. Judy**, 978 A.2d 1015, 1020 (Pa.Super. 2009)).  Further:

> [P]rosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Prosecutorial misconduct is evaluated under a harmless error standard.

*Id.* (quoting *Judy*, 978 A.2d at 1020).  Our Supreme Court has explained:

> [t]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that "[a] defendant is entitled to a fair trial but not a perfect one."

*Commonwealth v. Allshouse*, 36 A.3d 163, 182 (Pa. 2012) (quoting

*Commonwealth v. Thornton*, 431 A.2d 248, 251 (Pa. 1981)) (alterations

in original).

The closing argument of the assistant district attorney ("ADA")

included the following references to Garcia's alibi witness, Aneesah Young:

> [ADA]:  We talked about Anee[sah], right off the bat, first question, "How old are you?"  And let's think about this, because beyond the fact that a 14-year-old hanging out with a 19-year-old is –
>
> [DEFENSE COUNSEL]:  Objection, Judge.
>
> THE COURT:  It's fair comment.  Overruled.
>
> [ADA]:  Sorry, Judge.  Is beyond the pale.  I mean there's no question.  I mean that's revolting that a 14-year-old young girl –
>
> [DEFENSE COUNSEL]:  Objection.
>
> THE COURT:  That I will strike.  The word "revolting," that is stricken.  The jury will not consider that word.
>
> [ADA]:  We know what this is.  But beyond that, what is it? It's a crime.  It's a crime.
>
> [DEFENSE COUNSEL]:  Objection.
>
> THE COURT:  Overruled.

[ADA]: You cannot be in the presence of – a 19-year-old man should not be with someone unless they're above the age of 16.

[DEFENSE COUNSEL]: Objection, Judge. May we be heard at sidebar?

THE COURT: I'll let you be heard when the DA has completed his closing. Thank you.

[ADA]: So what does she do? She comes in here and lies about her age. She lies about her age.

She tells the detectives when they go out and talk to her – by the way, let's think about this. Miss Hard[ee] is subpoenaed to come to that grand jury on August the 8th. Who does she show up with? She shoes up with Anee[sah] Young, who no one had even seen before. Law enforcement never even heard about her.

She shows up and say[s], "I'm here in the grand jury, take my testimony, and take Anee[sah]'s too." Who is she? Oh, let's go get her on paper. Then let's bring her into the grand jury.

We get her on paper. She says, "I was with him the whole time," which we know is a lie, which she tell[s] us is untrue. Let's get her in front of the grand jury.

She doesn't show up at the grand jury. We subpoena her. She doesn't show, like it's an invitation to a party. She doesn't show up because she wasn't brought down there by Miss Hard[ee] like she was on August 8th.

She tells the detectives that she is 15 years old when she's interviewed in August. That would make her 14 at the time of the shooting. She comes into this courtroom and says, "I'm actually 17. Okay. What's your date of birth? '96." We can do math. That would make her 18.

She couldn't even tell you what her date of birth was. Because what is she trying to do? She's trying to cover for [Garcia]. She doesn't want him to get in any trouble because he was hanging out with a 14-year-old at the time.

N.T., 2/13/2016, at 67-70 ("Tr. Trs. III").

After the ADA's closing, the following exchange occurred out of the jury's presence:

> [DEFENSE COUNSEL]:  Judge, I have a motion for a mistrial.
>
> Counsel's argument during the point at the end where he's talking about Anees[ah] and making a suggestion to the jury that my client is not only a murderer, which he's been saying the entire trial, but now calling him a child molester and he has committed a crime –
>
> THE COURT:  I didn't hear that word.
>
> [DEFENSE COUNSEL]:  He said many times before he's committed a crime just by being in her presence, just by being in her presence, and he mentioned sex and the context with which it was.  That's a prior bad act that was never charged, that never came up during trial.
>
> There's no evidence whatsoever what Miss Young's real date of birth is anyway.  So it's assuming facts that aren't in evidence.
>
> It's incredibly prejudicial at the end of this long case to, in your closing argument, just all of a sudden say, you know, if that's not enough, he's also guilty of statutory sexual assault.  I mean that's ridiculous, Judge.
>
> THE COURT:  I understand your argument.
>
> [DEFENSE COUNSEL]:  May I just finish?  There's no curative instruction that this Court could give that could take that out of the jury's mind, that could unring that bell.
>
> Whatever they think of Mr. Garcia now, they are left with the impression that certainly he might be, along with all these other things, committing other crimes that weren't charged.
>
> There was no bills of information, that there was no discovery ever given, and yet he wants to come – this is well beyond fair comment, Judge.  It's based on facts that aren't in this case.

THE COURT: Thank you so much.

. . .

[ADA]: When Miss Young came into this courtroom and committed perjury about her date of birth, it's absolutely worth fair – it's his witness. It's worth fair --

. . .

Judge, I never mentioned the word sex. I never indicated he was a child molester. I don't' know what words he was listening to. But it is a reason why she fabricated evidence in this case and it's certainly worth comment.

THE COURT: I do view it as fair comment and say the motion for mistrial is denied.

[DEFENSE COUNSEL]: Note my exception.

Tr.Trs. III at 74-77.

The trial court found that the closing argument did not prejudice Garcia and did not deny him a fair trial. Opinion, 2/5/2016, at 42 ("1925(a) Op."). The trial court reasoned that the ADA did not mention the word "sex" or "indicate[] that [Garcia] was a child molester" and that the ADA properly referenced Young's testimony regarding her age because "it is a reason why she fabricated evidence in this case and it's certainly fair comment." *Id.* at 42-43.

The references to Young's inconsistent testimony regarding her age were proper. Stressing those inconsistencies, which were probative of her truthfulness, was a fair response to defense counsel's argument that Young's alibi testimony should be believed. Similarly, the ADA's suggestion that Young and Garcia had a close relationship properly highlighted her possible bias and provided a reasonable explanation for why she would fabricate her

alibi evidence. At one point, however, in response to a defense objection, the ADA stated that Garcia committed "a crime" because "a 19-year-old man should not be with someone unless they are above the age of 16." Tr. Trs. III at 68.

Garcia argues that the ADA's statement was, in effect, a reference to a prior bad act – statutory sexual assault – that was never charged and never raised during the trial.[10] While we agree that the ADA's reference to criminal conduct never raised at trial was improper, we conclude that the trial court did not abuse its discretion by denying Garcia's motion for a mistrial. It was proper for the ADA to argue that Young had a close relationship with Garcia,

_____

[10] Pennsylvania Rule of Evidence 404 provides:

(b) Crimes, Wrongs or Other Acts.

*(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

*(3) Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

and that, like Garcia's mother, Young was biased. It further was proper for the ADA, in support of the argument that Young was biased and incredible, to highlight the inconsistency regarding her age. A passing reference to the possibility that that close relationship might be criminal, in the context of this murder prosecution, was harmless error. In short, the record does not support a claim that these comments "prejudice[d] the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Caldwell*, 117 A.3d at 774. Accordingly, we affirm the trial court's denial of Garcia's motion for a mistrial.

## IV.   **Admissibility of Garcia's Statements**

Garcia next argues that the trial court erred when it denied his motion to suppress the statements he made at the police station. To this Court, he asserts two bases in support of suppression: (1) his extended detention constituted an arrest without probable cause in violation of the Fourth Amendment, Garcia's Br. at 23-29; and (2) his statements were involuntary because the delay in questioning him was "coercive, unnecessary, and unreasonable under the totality of the circumstances," *id.* at 9, 29.

When reviewing a denial of a suppression motion, we must determine whether the record supports the trial court's factual findings and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Brown*, 64 A.3d 1101, 1104 (Pa.Super. 2013). We may only consider evidence presented at the suppression hearing. *In re L.J.*, 79 A.3d 1073,

1085-87 (Pa. 2013). In addition, because the Commonwealth prevailed in the suppression court, we consider only the Commonwealth's evidence and so much of the defense evidence "as remains uncontradicted when read in the context of the record as a whole." **Brown**, 64 A.3d at 1104 (quoting **Commonwealth v. Cauley**, 10 A.3d 321, 325 (Pa.Super. 2010)). We may reverse only if the legal conclusions drawn from the facts are in error. **Id.**

### A. Fourth Amendment Violation

Garcia's principal argument before this Court is that he was subject to the functional equivalent of an arrest at a time when the police lacked probable cause to detain him. Whatever the merits of this claim, Garcia waived it by failing to present it to the trial court. The motion to suppress that Garcia filed below was based not on the Fourth Amendment but rather on **Miranda** and due process. In particular, Garcia argued as follows:

> 1. On December 7, 2013 at 2:00 p.m., 19 year old Arkel Garcia was arrested by Philadelphia Police and transported to Philadelphia Police Homicide Unit.
>
> 2. On December 8, 2013, at approximately 2:30 p.m., after being held in custody and not charged for over twenty-four hours, Philadelphia Police took a written statement from Mr. Garcia.
>
> 3. In the statement, Mr. Garcia purportedly admits to taking part in a robbery with two other individuals and that during the course of the robbery, one of the males shot and killed the decedent. **See** Statement of Arkel Garcia, 12/8/13, attached as Exhibit "A".
>
> 4. Police failed to properly advise Mr. Garcia of his **Miranda** Warnings prior to interrogating him.

- 25 -

5. Police did not allow Mr. Garcia to meet with an attorney or his family members prior to interrogating him.

6. The statement obtained from Mr. Garcia was not voluntary.

7. Police employed illegal and unconstitutional interrogation tactics to obtain a statement from Mr. Garcia. **See Commonwealth v. Perez**, 845 A.2d 779 (Pa. 2004).

8. Under the totality of the circumstances, Police denied Mr. Garcia due process by holding him in custody for over twenty-four hours without formally charging him with a crime, and denying him access to family and an attorney. **See** []**Perez**, 845 A.2d [at] 786-87[.]

Garcia's Mot. to Suppress Statement, 1/22/15, at ¶¶ 1-8.

Further, Garcia's arguments at the suppression hearing focused on the alleged due process violation and the violation of **Miranda**, not on whether he was arrested without probable cause. N.T., 1/22/15, at 4-6, 95-103. Those arguments included that: the police violated Garcia's Fourteenth and Fifth Amendment rights; the police held Garcia in custody for 24 hours without charging him; Garcia was not permitted to speak with a lawyer or his family; Garcia was a nineteen year old with limited experience with the criminal justice system; the police used overly subversive tactics; and Garcia did not voluntarily waive his **Miranda** rights. Suppression Hr'g at 5-6, 95-97.

In contrast, on appeal Garcia does not maintain that he was arrested when he was picked up and taken to the police station, and does not argue his statements were inadmissible because they were obtained in violation of **Miranda**. Rather, he contends that he was illegally arrested later, "when an

- 26 -

unidentified person in the homicide unit decided to detain him in a locked interrogation room." Garcia's Br. at 24. He argues that the detention became so coercive, due to both its length and its location, as to constitute the functional equivalent of an arrest and that the arrest was illegal because it was not supported by probable cause. *Id.* at 27, 28. He concludes that, because he was arrested without probable cause, the later-obtained statements were inadmissible. *Id.* at 28-29.

The Commonwealth did not raise waiver in its brief. Nevertheless, because Garcia failed to make this argument below, the Commonwealth did not have the opportunity to address it before the trial court, particularly by presenting evidence at the suppression hearing that might have undermined the factual basis for the claim. *See* Pa.R.Crim.P. 581(D) (suppression motion "shall state specifically and with particularity the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof"); *Commonwealth v. Dixon*, 997 A.2d 368, 376 (Pa.Super. 2010) (*en banc*) (Commonwealth need not present evidence to refute suppression theories not advanced in motion to suppress). As a result, not only did the trial court not address this claim (because it was not

presented) but both that court and this one lack an appropriately developed record on which to rule. Accordingly, we find the issue waived.[11]

### B. Due Process Violation

Garcia's due process argument, while properly preserved, is without merit.

The Pennsylvania Supreme Court has stated:

> The test for determining the voluntariness, and thus the admissibility, of an accused's statement is the totality of the circumstances surrounding the statement. [**Perez**, 845 A.2d at 787]. The mere fact that there is some passage of time between when an accused is arrested and when he or she gives an inculpatory statement does not constitute grounds for suppression of the statement. **Id.** This Court has set forth the following numerous factors that should be considered under a totality of the circumstances test to determine whether a statement was freely and voluntarily made: the duration and means of interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof; the length of the accused's detention prior to the confession; whether the accused was advised of his or her constitutional rights; the attitude exhibited by the police during the interrogation; the accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated; the conditions attendant to the detention, including whether the accused was deprived of food, drink, sleep, or medical attention; the age, education, and intelligence of the accused; the experience of the accused with law enforcement and the criminal justice system; and any other factors which might

---

[11] Garcia may seek to file a petition pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-46, to allege ineffective assistance of counsel for failing to raise the Fourth Amendment claim below.

serve to drain one's powers of resistance to suggestion and coercion. *Id.* at 785, 787.

*Commonwealth v. Bryant*, 67 A.3d 716, 724 (Pa. 2013).

Here, the trial court concluded:

> Having weighed all facts and circumstances surrounding the making of [Garcia's] statement, including [Garcia's] age, intelligence, personality, education, and mental and physical state; how [Garcia] was treated before, during, and after questioning; the time, place, and conditions under which [Garcia] was held and was questioned; the motives and attitudes of the police who questioned him; and what was said and done by the police and [Garcia] during the questioning process, this court is satisfied that [Garcia's] statement was the product of an essentially free will and choice and not of a will and choice overborne by pressure.

1925(a) Op. at 53.

The record supports these factual findings, and the trial court's legal conclusions are correct.[12]  *See Bryant*, 67 A.3d at 724-25 (confession voluntary even though appellant held for a lengthy period of time because "part of the reason for this was the enormous amount of evidence potentially relevant to the murders that the detectives were continuing to analyze"; appellant was given food and drink, was allowed to use a bathroom, was given the opportunity to sleep and did in fact sleep; no psychological pressure was placed on Appellant during his time in custody); *Perez*, 845 A.2d at 789 (finding no error in trial court's denial of suppression motion

---

[12] We note that Garcia' due process argument in his appellate brief is largely undeveloped, and he makes no effort to explain why his statements to the police were not freely and voluntarily made.

where: no evidence that delay in questioning was aimed at overcoming appellant's will or that appellant was subject to coercive tactics; detective began interviewing appellant within five hours of arrest; appellant was given *Miranda* warnings; interview took place in the captain's office; Detective Fetters was the only officer who stayed in the room with appellant; there were several breaks taken during the statement; appellant was permitted to use the bathroom and was given something to eat; appellant did not tell detectives he wanted to stop the interview or that he did not understand the conversation).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/27/2017